Lucy D. Gilpin v. Commissioner.
Gilpin v. Commissioner
Docket No. 8014.
United States Tax Court
1947 Tax Ct. Memo LEXIS 256; 6 T.C.M. (CCH) 370; T.C.M. (RIA) 47085; April 8, 1947
*256 In 1941 petitioner deducted a loss resulting from a transaction entered into for profit in 1937 with one, Robert J. Boltz. Under the facts, held, the loss was reasonably certain and ascertainable in amount in 1940 and respondent's determination in disallowing the loss in 1941 is sustained, notwithstanding the recovery of a small part thereof in years subsequent to 1941. A. Edwin Gilfillan, Esq., 1500 Liberty Trust Bldg., Broad and Arch Sts., Philadelphia 7, Pa., for the petitioner. Karl W. Windhorst, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: Respondent determined an income tax deficiency for 1941 in the amount of $3,003.13. The sole issue is whether petitioner sustained a loss of $10,708.24 in 1941. The facts were partially stipulated. From the stipulated facts, the testimony and the documentary evidence we make the following Findings of Fact The petitioner is an individual. Her income tax return was filed with the collector of internal revenue in Philadelphia, Pennsylvania. On June 1, 1937, petitioner acquired from her husband, John C. Gilpin, in consideration of $14,346.19, an assignment of his rights *257 under a contract dated July 28, 1936 between him and one Robert J. Boltz. Under the contract Boltz was to act as attorney-in-fact for Gilpin as he had been doing for investors since 1933. Boltz was authorized to hold or sell, according to his judgment, the securities deposited by Gilpin, to invest the proceeds of sale, and to intermingle funds in one or more attorney bank accounts with other funds held under similar agreements, but with no other funds. Boltz could purchase securities for his principals in his own name as attorney and take delivery of one or more certificates or bonds, representing the aggregate of purchases for several principals under identical agreements, without separate certificates or bonds for each account. The purchase for a particular principal was to be immediately allocated on the books and records of Boltz to the principal's account as the sole and several owner thereof. The contract imposed no liability on Boltz for honest losses on investments. Boltz was required by the agreement to make quarterly statements to his principals showing all transactions during the preceding quarter, income actually received and securities on hand at the close of the quarter. *258 Prior to June 30, 1937 the quarterly statements were received regularly by John C. Gilpin. Beginning June 30, 1937, and thereafter, the quarterly statements were regularly received by petitioner following notice from her husband to Boltz of the aforementioned assignment and transfer of the account to petitioner. The last quarterly statement received by petitioner was for the quarter ending March 31, 1940. The agreements between Boltz and his principals permitted the principal to withdraw on ten days' notice the whole or any portion of his fund including any increment thereto. On July 22, 1938, Boltz paid the petitioner at her request $1,500 out of purported earnings. Petitioner made no other request for the withdrawal of cash or securities and, except for said $1,500, received none. During the period January 1, to October 21, 1940 cash aggregating over $192,000 was withdrawn by 117 principals from their respective accounts with Boltz. During the same period cash and securities aggregating over $199,000 were deposited by 39 principals in their accounts. The largest sums withdrawn and deposited by a single principal during this period were $28,000 and $35,000, respectively. Boltz *259 occupied a large suite of offices in the heart of Philadelphia's financial district. He employed between four and six persons and his records indicated that he spent approximately $25,000 per year in maintaining the establishment. He had an excellent reputation in Philadelphia as a shrewd and successful investor and stock market operator. Petitioner was unaware that Boltz had been guilty of any irregularities in his operations until she was so notified on October 25, 1940. On that day, she and other principals were notified by letter that Boltz had disappeared and had not been heard from since October 22, 1940, and that preliminary survey of his accounts indicated that there had been irregularities in their operation. On October 28, 1940, involuntary proceedings in bankruptcy, No. 21524, in the United States District Court for the Eastern District of Pennsylvania, were begun against Robert J. Boltz, and a temporary receiver was appointed by the court. On November 4, 1940, the appointment of the receiver was made permanent and on the same date the receiver of the bankrupt estate was authorized to employ a certified public accountant. On November 7, 1940, a single indictment was *260 found in the Court of Quarter Sessions of Philadelphia County, Pennsylvania, charging that Boltz had, without registration and without license by the Pennsylvania Securities Commission, engaged in a transaction of $5,500,000 involving securities. By letter dated November 9, 1940, petitioner was notified by a protective committee of Boltz's principals with respect to the actions they had taken, was advised of the complexities that existed, was informed that the committee believed that the purposes for which it was appointed had been accomplished and that there was no further need for it to act as a committee, and was advised, to take such further steps as she deemed necessary best to protect her interests through her own counsel. On November 13, 1940, Boltz was adjudicated a bankrupt. On November 13, 1940, the receiver of the bankrupt estate filed a petition for leave to sell all the personal property belonging to Boltz. In an appraisal filed on December 4, 1940, the assets of the bankrupt estate as of November 30, 1940, were appraised at $19,381.99 The appraisal did not include Boltz's country estate in Bucks County, Pennsylvania, because of title being vested in him and his *261 wife. Settlement was later made with the wife which resulted in a sale of the real estate the latter part of 1941 whereby the bankrupt's estate realized $75,000. A $30,000 mortgage had to be paid off out of the amount realized. On December 4, 9, and 18, 1940, sales with respect to the he personal property were held. The sales were immediately confirmed by the referee. The total amount of the sales was $21,310.95, which sum was approximately $10,000 in excess of the total appraised value. On December 6, 1940, the accountant employed by the receiver filed his preliminary report with respect to the examination of Boltz's books and records. The report stated that Boltz should have had on hand on the date he absconded, i.e., October 22, 1940, moneys and securities belonging to his principals in the total amount of $2,253,426.09. Claims greatly in excess of $1,000,000 were filed by the principals in the bankruptcy proceedings, and thereafter were duly allowed by the referee. The claim of the petitioner was filed in the sum of $15,633.98 and was allowed in the sum of $10,708.24 as stipulated by agreement between her, and the trustee of the bankrupt estate, whose appointment is hereinafter *262 referred to. On December 30, 1940, upon evidence presented to the grand jury, sundry indictments were found against Boltz in the Court of Quarter Sessions of Philadelphia County, on charges of embezzlement of broker and agent, embezzlement by attorney-in-fact, and fraudulent conversion. A true bill was issued with respect to the amount of each principal, including the petitioner's account. On January 6, 1941 the receiver's bond in the bankrupt estate was increased from $20,000 to $35,000. On February 13, 1941 Boltz was arrested in Rochester, New York. On February 17, 1941 the receiver of the bankrupt estate was authorized to continue the employment of the certified public accountant for further examination of the bankrupt's books and records at an additional cost not to exceed $4,500. On February 18, 1941 Boltz went on trial in the Court of Quarter Sessions of Philadelphia County. When arraigned he pleaded guilty to all of the bills of indictment. Prior to imposing sentence, the court received testimony from numerous witnesses and Boltz testified in his own behalf. He testified that for some years prior to his absconding he had made no profits and few investments, merely *263 paying those principals who requested their money, and expenses and mythical profits out of funds collected from other principals. He admitted it was a matter of "robbing Peter to pay Paul." He further testified that he had kept his own books of original entry; that he had personally made all trades, operated the bank accounts, kept all books with respect to receipt and disbursement of all cash and securities, and opened his own mail. On his plea of guilty he was sentenced to serve not less than 20 nor more than 40 years in the Pennsylvania Eastern State Penitentiary. On March 25, 1941 the first meeting of the creditors of the bankruptcy proceedings was held with the referee. On the same date a trustee of the bankrupt estate was appointed. On July 30, 1942 the trustee of the bankrupt estate paid a preliminary dividend of 2 per centum. On December 17, 1943 the trustee paid a final dividend of 1.04165 per centum. The petitioner received on said dates the respective amounts of $214.16 and $111.54. Petitioner's income tax returns for 1940 and 1941 were prepared for her by her husband, an attorney of 40 years' experience. In fixing the year in which she sustained a loss in the Boltz *264 investment, he took into consideration the contract with Boltz, the statements of her account, Boltz's disappearance and the subsequent proceedings in bankruptcy and otherwise. Petitioner was advised by her husband that the loss was sustained in 1941, and a deduction of $10,708.24 was claimed in her 1941 income tax return. The books and records belonging to Boltz, except as to the receipt and disbursement of cash and securities, were completely false to petitioner were also completely false and fictitious except as to the payment of $1,500 to her on July 22, 1938. During 1940 and for years prior thereto the amounts lost, dissipated or repaid to principals exceeded the receipts from principals and from all other sources. It was a chronic practice during said years for Boltz to expend money as quickly as he received it. Boltz was completely insolvent at all times during said years. Except for the farm aforementioned, none of the other purported assets of the bankrupt's estate proved to be of value, and no hidden assets existed. The other purported asserits consisted of possible claims against banks and brokers with whom Boltz had dealt, possible claims against investors with Boltz *265 who had closed their accounts at a profit, and certificates of a non-existent investment company. Petitioner sustained a loss from her investment with Boltz in 1940. The omitted portions of the stipulated facts are incorporated herein by reference. Opinion The facts in this case establish that petitioner has sustained a loss and the amount thereof. The question we must decide is whether that loss was sustained in the taxable year 1941, as contended by petitioner, or in 1940 as contended by respondent. The latter relies upon our decision in . The Felton case involved another investor with Boltz who was victimized by the same acts of dishonesty that defrauded this petitioner. The position of the taxpayer in that case was that the identifiable events which fixed the year of loss occurred in 1940. The respondent denied the deduction. He determined that the loss was a loss due to embezzlement and was sustained prior to 1940 because of the general insolvency of Boltz. This court agreed with the petitioner and held that "under these facts, the identifiable event which determined petitioner's loss was the disappearance of Boltz in 1940." *266 Petitioner accepts the Felton decision to the extent that the loss was not sustained in a year prior to 1940. She would distinguish this case upon the ground that no question was there presented as to the right of Felton to deduct the loss in 1941. She contends that a conclusion here similar to that reached in the Felton case is not justified where the events are differentiated as between 1940 and 1941 as has been done here. The events upon which petitioner relies to differentiate this case from the Felton case, relate almost entirely to possible assets investigated during the course of the bankruptcy proceedings in 1940. Petitioner hoped that some of these possible assets would prove to be valuable in 1941. As a matter of fact only one of them, the farm, ever proved to be of any value to the bankrupt's estate. The other possible assets from which she hoped additional sums might be realized by the bankrupt's estate consisted on December 31, 1940, of certificates in a non-existent investment company, possible claims against two banks and two brokerage firms that had dealt with Boltz, possible claims against principlas who had withdrawn sums from their accounts to their own enrichment, *267 and possible hidden assets not yet uncovered. The facts weighing against any value remaining in petitioner's account with Boltz, possible claims two banks and two brokerage firms that had dealth with Boltz, possible claims against principals who had withdrawn sums from their accounts to their own enrichment, and possible hidden assets not yet uncovered. The facts weighing against any value remaining in petitioner's account with Boltz on December 31, 1940 are numerous and persuasive. The last quarterly statement that petitioner received from Boltz was for the quarter ending March 31, 1940. Failure to receive a statement for the second or third quarter, should have at least put her on notice that something was amiss. The letter received on October 25, 1940, notifying her of Boltz's disappearance and that a preliminary survey of his account dictated irregularities in his operations should have strengthened the conviction. The swift sequence of events following Boltz's disappearance on October 22, 1940, become less confusing when considered chronologically. Bankruptcy proceedings were started in October 1940; a permanent receiver appointed early in November; a single indictment found *268 against Boltz on November 7th; petitioner advised by the protective committee that it had ceased to function as a committee and that she should protect her own interests through counsel; Boltz adjudicated a bankrupt in November; the assets of the bankrupt's estate appraised at a little over $19,000; all the personal property of the bankrupt's estate sold in December 1940 for a little over $21,000; a preliminary report by the accountant showed that Boltz should have had on hand when he absconded money and securities of his principals in excess of $2,250,000; that claims filed in the bankruptcy proceedings, including petitioner's greatly exceeded $1,000,000; that the receiver's bond in 1940 was a mere $20,000; that Boltz was indicted late in December 1940 on various charges; and finally, the determination by this court in the Felton case that the identifiable event that fixed the year of the loss was Boltz's disappearance in 1940. Boltz's disappearance in October, 1940, with other successive events, justifies the conclusion that petitioner's investment became worthless prior to 1941. . Paraphrasing the language of the Supreme Court *269 in the cited case we too have serious losses over a period of years, receivership, receiver's reports, an excess of liabilities over assets, a termination of operations, and a bankruptcy sale. These factors, coupled with Boltz's disappearance and his indictments convince us that petitioner's investment became worthless prior to 1941. Petitioner has the burden of establishing that her claimed loss was in fact sustained in the taxable year, Boehm case, supra. to prevail she must show that the bankrupt's estate had assets of substantial value at January 1, 1941, and that she sustained her loss when such value disappeared during the taxable year. Petitioner has not attempted to place a value on the investment certificates or the possible lawsuits against the banks, brokers and others and we are unwilling to speculate as to the value thereof. The facts show that the bankrupt's estate had at December 31, 1940 assets listed on the receiver's appraisal (or cash from the sale thereof), plus a claim against Boltz's property rights in a farm in Bucks County, Pennsylvania. The value of the farm as of December 31, 1940, or at any other time, is undisclosed. We know that title to the farm was *270 vested in Boltz and his wife. We know that the farm was mortgaged. We know that late in 1941 the estate realized $45,000 on Boltz's interest therein, but we do not know that this value or any other value could be attributed to Boltz's interest in the farm on December 31, 1940. And even if we attributed a value of $45,000 thereto on December 31, 1940, which value was not established, petitioner's chances of recovering any substantial portion of her investment would be purely speculative in view of the total claims against and the costs of administering the bankrupt's estate. It is well recognized that a loss may be so reasonably certain in fact and ascertainable in amount that a deduction is under certain circumstances justified even before the loss is absolutely realized. . Recovery of a small part of a a loss in a subsequent year does not invalidate the deduction for the statute contemplates "that a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment." ; , *271 petition to review dismissed October 6, 1941, , where subsequent to the taxable year taxpayer recovered almost a fourth of the loss deducted; ; ; reversing ; , affirming B.T.A. Memorandum Opinion; , and The loss could not have been sustained in 1941 as claimed by petitioner as there was no change in the asset values and no distribution during that year. If the assets had any value at December 31, 1940 it remained until a year subsequent to 1941. Decision will be entered for the respondent.